SEEGER WEISS LLP
CHRISTOPHER A. SEEGER
DAVID R. BUCHANAN
JENNIFER R. SCULLION
550 Broad Street, Suite 920
Newark, NJ  07102
Telephone:  973/639-9100
973/639-9393 (fax)
cseeger@seegerweiss.com
dbuchanan@seegerweiss.com
jscullion@seegerweiss.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
DAVID W. MITCHELL
BRIAN O. O'MARA
ALEXANDRA S. BERNAY
CARMEN A. MEDICI
ARTHUR L. SHINGLER III
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

Attorneys for Plaintiff
[Additional counsel appear on signature page.]

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| NECA-IBEW WELFARE TRUST FUND, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> ACTAVIS HOLDCO U.S., INC., LANNETT COMPANY, INC. and EPIC PHARMA, LLC, <br><br> Defendants. | No. <br><br> COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT AND THE CLAYTON ANTITRUST ACT <br><br><br><br><br><br> DEMAND FOR JURY TRIAL |

Plaintiff NECA-IBEW Welfare Trust Fund ("plaintiff"), with its principal place of business at 2120 Hubbard Drive, Decatur, Illinois 65256, individually and on behalf of a class of all those similarly situated, brings this action for treble damages and injunctive relief against Actavis Holdco U.S., Inc. ("Actavis"), Lannett Company, Inc. ("Lannett") and Epic Pharma, LLC ("Epic") (collectively, "defendants") for violations of the Sherman Antitrust Act ("Sherman Act"), the Clayton Antitrust Act ("Clayton Act") and the laws of the several states identified herein. Based on counsel's investigation, research and review of publicly available documents, on plaintiff's personal knowledge, and upon information and belief, plaintiff alleges as follows:

## NATURE OF THE ACTION

1.      Generic drugs are a key component of the healthcare system, accounting for approximately 88% of all prescriptions written in the United States and over $74 billion in annual sales.[1]  Importantly, entry of generics into the market is intended to increase competition and decrease prices for the benefit of consumers and the nation's healthcare system. Indeed, competitive generic treatments are essential to delivering adequate and affordable healthcare. Generic drugs generally can be priced at over 30%-80% less than branded drugs and thus are meant to lower prescription costs for patients, employers and healthcare providers. In recent years, however, the prices of certain commonly prescribed generic drugs have skyrocketed. And normal market forces cannot explain these dizzying hikes. A series of acquisitions has reduced the

---

[1]   *See* http://www.fda.gov/Drugs/ResourcesForYou/Consumers/BuyingUsingMedicineSafely/UnderstandingGenericDrugs/ucm167991.htm (last accessed Dec. 14, 2016).

number of market participants, and these highly concentrated markets have created opportunities for competitors to conspire with one another to hike prices for generic pharmaceuticals far beyond what they would otherwise be in a competitive market.

2.      Generic ursodiol, or ursodeoxycholic acid, in capsule form ("Ursodiol")[2] is a bile acid that decreases the amount of cholesterol produced by the liver and absorbed by the intestines and is prescribed for gallbladder stone dissolution. Ursodiol is a significantly prescribed drug in the United States, particularly for older American consumers.  In mid-2014, Ursodiol experienced a dramatic price increase. Beginning in early May 2014 – soon after generic pharmaceutical manufacturer meetings in mid-February 2014 in Orlando, Florida, attended by defendants Actavis and Epic – and continuing through June 2014 – just after another generic pharmaceutical manufacturers' meeting attended by defendants Actavis and Lannett – defendants dramatically inflated their generic Ursodiol prices.  Indeed, within that timeframe, defendants' Ursodiol prices increased from roughly $2 per unit to between $6-$7 per unit – over 200% in less than two months.  Since that time, defendants have maintained Ursodiol prices at these supracompetitively high levels.[3]  Moreover, defendants' Ursodiol price inflation was done in lockstep, with defendants

---

[2]    As used herein, "ursodiol" refers to the drug generally, regardless of form. "Ursodiol" (with an upper case "U") refers specifically to the capsule form.

[3]    Unless otherwise indicated, (i) sales data is based on the Actual Acquisition Cost, which is the dollar amount retail brick-and-mortar and mail-order pharmacies pay to wholesalers for the given products, (ii) quantity data is based on the number of units in the total prescription dispensed for the associated products, and (iii) pricing data is the calculated per-unit price for the associated products.

coordinating the unprecedented price hikes during a short, roughly two-month period, as the inflation of their prices illustrates.



3.     Such sudden and suspicious increases of generic drug prices have outraged not only the nation's payers and consumers, but also public officials.  In July 2014, the State of Connecticut launched an investigation into anticompetitive generic drug pricing, followed by a Congressional inquiry and a criminal grand jury investigation by the United States Department of Justice ("DOJ") Antitrust Division.

4.     Investigation quickly led to action, as several generic drug companies have been the target of governmental investigations into anticompetitive generic drug pricing.   On November 3, 2014, Lannett – who, with its co-conspirators here, manufactures and sells Ursodiol – reported that its Senior Vice President of Sales and Marketing had been served with a grand jury subpoena from the DOJ, relating to a federal investigation of the generic pharmaceutical industry and possible Sherman Act violations.  The subpoena requests Lannett corporate documents relating to its pricing

and sales of generic drugs and communications or correspondence with competitors regarding the sale of generic prescription medications for the time period of 2005 through the date of the subpoena. Lannett itself received a subpoena on December 5, 2014, similarly requesting corporate documents relating to corporate, financial and employee information, and communications or correspondence with competitors regarding the sale of generic prescription medications and the marketing, sale or pricing of certain products. Defendant Actavis – who, with its co-conspirators here, manufactures and sells Ursodiol – received a DOJ subpoena in June 2015 relating to the industry-wide investigation into generic drug pricing and communications with competitors. Lannett's and Actavis's primary Ursodiol competitor is their fellow defendant here, Epic. Each of Lannett, Actavis and Epic joined in inflating the price of Ursodiol. On November 3, 2016, it was announced that the DOJ expected to begin filing charges arising from its investigation by the end of 2016, and on December 14, 2016, the first DOJ indictment was unsealed, bringing criminal charges in connection with the pricing of certain generic antibiotics and diabetes treatments. The following day, on December 15, 2016, a group of twenty state attorneys general filed suit against six generic-drug makers, alleging the companies conspired to fix prices and constrain competition for certain antibiotics and diabetes treatments. Further charges, brought by the DOJ or other officials, are expected in 2017.

5.     There is no reasonable justification for defendants' abrupt and uniform shift in pricing conduct. Indeed, as demonstrated more fully herein, defendants engaged in a continuing agreement in restraint of trade to artificially raise the price of generic Ursodiol. Accordingly, plaintiff NECA-IBEW Welfare Trust Fund,

individually and on behalf of a class of those similarly situated, seeks injunctive relief, damages and all other appropriate relief for defendants' wrongdoing.

## JURISDICTION AND VENUE

6.      Plaintiff's claim for injuries sustained by reason of defendants' violations of §§1 and 3 of the Sherman Act, 15 U.S.C. §§1 and 3, are brought pursuant to §§4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26, to obtain injunctive relief and the costs of this suit, including reasonable attorneys' fees.

7.      This action is also instituted under the antitrust, consumer protection and common laws of various states for damages and equitable relief, as described below.

8.      This Court has original federal question jurisdiction over the Sherman Act claims asserted in this Court, pursuant to 28 U.S.C. §§1331 and 1337, and §§4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26.

9.      Venue is proper in this judicial district pursuant to §§4(a) and 12 of the Clayton Act, 15 U.S.C. §§15(a) and 22, and 28 U.S.C. §1391(b), (c) and (d), because during the Class Period (May 9, 2014 through the present) one or more of the defendants resided, transacted business, was found, or had agents in this District, and a substantial part of the events giving rise to plaintiff's claims occurred, and a substantial portion of the affected interstate trade and commerce described below has been carried out, in this District.  Venue is also proper in this District because acts in furtherance of the alleged conspiracy took place here, where Actavis is headquartered.

10.      Venue is also proper because each of the defendants operates and transacts business within the District, each of the defendants has substantial contacts with this District, and each of the defendants engaged in an illegal price-fixing

conspiracy that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District.

## THE PARTIES

11.     Plaintiff NECA-IBEW Welfare Trust Fund is an employee health and welfare benefit plan with its principal place of business at 2120 Hubbard Avenue, Decatur, Illinois 62526.   Plaintiff indirectly purchased, paid and/or provided reimbursement for generic Ursodiol products, other than for resale, at supracompetitive prices in multiple states across the United States during the Class Period, and was thereby injured.

12.     Defendant Actavis is an Irish corporation with its global principal place of business in Dublin, Ireland and its U.S. administrative headquarters in Parsippany New Jersey.  During the relevant period, Actavis  marketed and generic Ursodiol throughout the United States.

13.     Defendant Lannett is a Delaware corporation with its principal place of business in Philadelphia, Pennsylvania.  During the relevant period, Lannett marketed and sold generic Ursodiol throughout the United States.

14.     Defendant Epic is a Delaware limited liability company with its principal place of business in Laurelton, New York.  During the relevant period, Epic marketed and sold generic Ursodiol throughout the United States.

15.      All acts alleged in this complaint to have been done by defendants were performed by their officers, directors, agents, employees or representatives while engaged in the management, direction, control or transaction of defendants' business affairs.

**Co-Conspirators**

16.     Various other persons, firms, corporations and entities have participated as unnamed co-conspirators with defendants in the violations and conspiracy alleged herein.  In order to engage in the offenses charged and violations alleged herein, these co-conspirators have performed acts and made statements in furtherance of the antitrust violations and conspiracies alleged herein.

17.     At all relevant times, each defendant was an agent of each of the remaining defendants, and in doing the acts alleged herein, was acting within the course and scope of such agency.  Each defendant ratified and/or authorized the wrongful acts of each of the other defendants.  Defendants, and each of them, are individually sued as participants and as aiders and abettors in the improper acts and transactions that are the subject of this action.

## INTERSTATE TRADE AND COMMERCE

18.     Throughout the Class Period, there was a continuous and uninterrupted flow of invoices and other documents essential to the sale and provision of Ursodiol transmitted interstate between and among the offices of defendants and their customers throughout the United States, its territories and the District of Columbia (the "United States").

19.     Throughout the Class Period, defendants transported substantial amounts of Ursodiol in a continuous and uninterrupted flow of interstate commerce throughout the United States.

20.    Throughout the Class Period, defendants' unlawful activities took place within and substantially affected the flow of interstate commerce and had a direct, substantial and reasonably foreseeable effect upon commerce in the United States.

## FACTUAL ALLEGATIONS

### Generic Drugs in the United States

21.    Since the implementation of the Hatch-Waxman Act in 1984, generic drugs have been a critical aspect of the nation's healthcare system, saving consumers and our healthcare system tens of billions of dollars annually, and have long being referred to as one of the few bargains in the U.S. healthcare system.  Enacted to simplify the regulatory process of bringing generic drugs to the public, the Hatch-Waxman Act eliminated the requirement that generic companies file a complex New Drug Application ("NDA") in order to obtain U.S. Food and Drug Administration ("FDA") approval, instead allowing drug companies to file an Abbreviated New Drug Application ("ANDA") and rely on the safety and efficacy data provided by the original NDA holder.  Additionally, the Hatch-Waxman Act made other changes related to the time period during which branded drugs would enjoy a period of generic marketing exclusivity.

22.    Generic drugs are exact substitutes for brand name drugs that have met standards for bioequivalence and pharmaceutical equivalence set by the FDA.  To be approved by the FDA through an ANDA, a generic drug product must contain the same active ingredient(s) in the same dosage form and in the same strength, and must be bioequivalent to the reference listed drug (*i.e.*, the original brand name version of the drug approved by FDA through an NDA).  Under the FDA rules, products that are

classified as equivalent can be substituted with the full expectation that the substituted product will have the same clinical effect and safety profile as the prescribed product.

23.     As an incentive to spur generic companies to provide alternatives to branded drugs, the first generic manufacturer to file a substantially complete and certified ANDA is allowed to market its generic drug free from competing generic manufacturers for a set period.  Often the first generic in the market comes in at a price well below the branded drug and quickly takes a large market share from the branded drug.  As more generics enter the market, the average generic price typically falls to 20% or lower of the branded price.  A recent study found that generic medicines saved consumers $193 billion in 2011 alone.  Stephen W. Schondelmeyer (BS Pharm, MA Pub Adm, Pharm.D., Ph.D., PAPhA, Professor and Head of the Department of Pharmaceutical Care and Health System, Century Mortar Club Endowed Chair in Pharmaceutical Management & Economics, University of Minnesota) has explained that the prices of the generics "continue to fall compared to the brand price, and their combined share of the market for the molecule, relative to the brand name equivalent, usually continues to grow."[4]  Professor Schondelmeyer also stated:

> The Congressional Budget Office has credited the Hatch-Waxman Act and, importantly, the process for easy and routine A-rated generic substitution by pharmacists with providing meaningful economic competition from generic drugs, and with achieving billions of dollars of savings for drug purchasers such as consumers and employers.

---

[4]  *See Why Are Some Generic Drugs Skyrocketing in Price?*:  Hearing before the S. Comm. on Health, Education, Labor and Pensions, 113th Cong. (Nov. 20, 2014) (Statement of Stephen W. Schondelmeyer).

24.     In his remarks to Congress in November 2014, Professor Schondelmeyer noted that price trends for generic drugs were rising, and rising at a rate far outstripping the rate of general inflation – a rate of 12.9% vs. 1.5%. He also explained that "[t]he average annual retail price increase for brand name prescription drug products in 2013 (12.9 percent) was more than two times higher than the average annual brand name drug price increase in 2006 (5.7 percent)."

25.     Ursodiol saw an average price hike of more than 141% between the end of May and the end of July 2014. Defendants' Ursodiol list price (or Wholesale Acquisition Cost ("WAC")) rose in the range of 563% to 1,035% as defendants aligned their WAC prices between the end of April and the end of June 2014. The price of Ursodiol continues to be inflated to this day. Defendants' 2014 WAC price hikes are illustrated below:



26.     The Actual Acquisition Cost of Ursodiol, which is the dollar amount retail brick-and-mortar and mail-order pharmacies pay to wholesalers, also strikingly demonstrates the uniformity of defendants' collusion, as illustrated below:



## Generic Drug Manufacture and Distribution

27.     Unlike branded drug manufacturers who develop novel drug compounds and then must spend years conducting studies prior to receiving FDA NDA approval, generic drug manufacturers do not develop new drugs.  Instead, generic drug manufacturers compound drugs in a variety of forms – capsules, creams, inhalants, injectables, liquids, ointments and tablets – that are identical to an original branded drug once that drug's patent protection has expired and the generic manufacturer has received FDA ANDA approval.

28.     Generic drugs may be manufactured by the same companies that manufacture brand-name drugs or may come from companies that manufacture

generics exclusively.  Drugs sold in the United States may be manufactured domestically or abroad, and many manufacturers that produce generic drugs for the U.S. market are foreign companies, or are owned by foreign companies.  For example, defendant Actavis's global headquarters are located in Dublin, Ireland.

29.    Generic drug manufacturers also manage the sale of drugs to many different drug wholesalers, distributors, retailers and group purchasing organizations. Wholesalers and distributors purchase pharmaceuticals from the manufacturers and distribute them to customers such as pharmacies, hospitals and medical facilities. Some of the larger wholesalers and distributors of generic drugs include Cardinal Health, Inc. and AmerisourceBergen Corporation.  Retailers of generic drugs include retail or supermarket chain pharmacies (such as Walgreens and Walmart), mail-order or specialty pharmacies, hospitals, healthcare plans and group purchasing organizations ("GPOs").  GPOs are membership-based entities that negotiate with manufacturers, wholesalers and distributors on behalf of a group of purchasers to obtain optimal prices and terms for their members.  GPOs can represent retail, governmental or healthcare groups, and some of the larger GPOs include Vizient and Premier, Inc.

30.    As the various generic drugs produced by different drug manufacturers are functionally identical, the competition between manufacturers to sell generic drugs to wholesalers, distributors, retailers and GPOs is largely based on each manufacturer's price and ability to provide supply for that drug.  The defendants in this action are all drug manufacturers/and or suppliers and as such should be

competing directly with one another for the sale of Ursodiol to myriad consumers in the United States.

**Ursodiol**

31.    Ursodiol – which has been available on the generic market since 2000 – is a bile acid that decreases the amount of cholesterol produced by the liver and absorbed by the intestines and helps break down cholesterol that has formed into gallbladder stones.  Ursodiol capsules are prescribed to treat small gallstones in people who cannot have gallbladder surgery.  The market for generic drugs such as Ursodiol is mature.  Hundreds of thousands of prescriptions for the drug were filled during the Class Period, with most prescriptions (81.6% in 2015, based on 2015 sales figures) in the capsule form.[5]  Annual sales of the drug in capsule form for 2015 were $433 million.

32.    Defendants dominated the Ursodiol market.  In 2014, Actavis's Ursodiol sales exceeded $155.2 million, Lannett's Ursodiol sales for the same period exceeded $86.8 million, and Epic's Ursodiol sales for the same period exceeded $60.7 million.  During the same timeframe, all other Ursodiol market participants had combined Ursodiol sales of roughly $5 million, or under 2% of the Ursodiol market, compared to defendants' collective roughly 98.3% of the market, as illustrated below:

---

[5]    Based on 2015 sales figures, a significantly smaller percentage of ursodiol – 22.4% – is sold in tablet form.  This less-pervasive form of ursodiol is principally manufactured or marketed by manufacturers other than the defendants here.  Notably, the tablet form also did not see the same rise in price that the defendant conspirators visited on consumers, indicating further that the prices here were the result of a conspiracy.



33.     Prior to 2014, the average price for Ursodiol had remained stable at around $2 per unit since at least as early as January 2011.  Then, following defendants' February and June 2014 meetings, the average price of Ursodiol rose abruptly during a two-month window:



34.     In contrast, during this same timeframe, the price movement of the less desirable, smaller market tablet form presents a far different picture than the market-dominating defendants' dramatic collusive price inflation of the capsule form of the drug.  In other words, the same molecule, "ursodeoxycholic acid," did not increase in price in this other form.  Also, it is significant that the defendants generally do not produce the ursodiol tablet form:



**Defendants' Price Hikes Were Dramatic and Uniform**

35.    As illustrated above, the hike in defendants' Ursodiol prices was dramatic and uniform.  At or around May 1, 2014, defendants' manufacturer list prices for Ursodiol (per unit) were:

| Manufacturer | 4/30/2014 |
|---|---|
| Epic | $0.45 |
| Actavis | $0.77 |
| Lannett | $0.77 |

36.    As the conspiracy unfolded over the next two months, defendants uniformly raised their Ursodiol list prices beginning in May 2014 as shown below and, by late June 2014, defendants' inflation of their Ursodiol list prices was complete and in line:

| Manufacturer | 5/7/2014 | 5/14/2014 | 6/25/2014 |
|---|---|---|---|
| Epic | $0.45 | $5.10 | $5.10 |
| Actavis | $0.77 | $0.77 | $5.11 |
| Lannett | $0.77 | $5.11 | $5.11 |

37.    Defendants' list price inflation had a direct impact on Ursodiol's Average Wholesale price ("AWP"), which is the price at which pharmaceuticals are purchased at the wholesale level.  Indeed, the magnitude of defendants' price inflation is indisputable, as illustrated by the following Ursodiol AWP for each defendant between April 30, 2014 and August 29, 2014:

| Manufacturer | 4/30/2014 | 5/30/2014 | 6/30/2014 | 7/31/2014 | 8/29/2014 |
|---|---|---|---|---|---|
| Epic | $2.01 | $5.22 | $5.93 | $6.43 | $6.49 |
| Actavis | $2.28 | $2.23 | $4.54 | $6.96 | $6.96 |
| Lannett | $1.91 | $1.92 | $2.69 | $6.04 | $6.19 |

**No Commercial Justification for Price Hike**

38.     There were no reasonable justifications for this abrupt shift in pricing conduct.  One reason prices might rise could be a supply disruption or shortage, but there was no such disruption or shortage related to ursodeoxycholic acid prior to, after or during mid-2014.  The FDA reported no ursodeoxycholic acid shortages, there was no new patent or formulation, no labelling changes and, once in production, ursodeoxycholic acid is not difficult to make.  Defendants have not provided any meaningful explanation for the coordinated price rise.  Indeed, there were no similar price hikes in other countries, including, for example, in the United Kingdom, Denmark or Norway.  Ursodiol prices have remained consistent in those countries as illustrated below:



**Governmental Investigations into Defendants' Activities**

39.     The hike in prices of generic drugs has resulted in government investigations, the results of which are unknown at this time.

40.     According to SEC filings by Lannett, on November 3, 2014, the DOJ served the company's Senior Vice President of Sales and Marketing with a grand jury

subpoena relating the DOJ's generic pharmaceutical industry investigation. According to Lannett, the investigation is specifically "into possible violations of the Sherman Act" and requests "corporate documents of the Company relating to communications or correspondence with competitors regarding the sale of generic prescription medications, but is not specifically directed to any particular product and is not limited to any particular time period."

41.     Similarly, on June 25, 2015, Actavis received a DOJ Antitrust Division subpoena that likewise seeks, according to its SEC filing, "information relating to the marketing and pricing of certain of the Company's generic products and communications with competitors about such products."

42.     That Actavis and Lannett received subpoenas from a federal grand jury seeking information about their generic prices and "competitors" is significant, as the DOJ's Antitrust Division Manual cautions that "staff should consider carefully the likelihood that, if a grand jury investigation developed evidence confirming the alleged anticompetitive conduct, the Division would proceed with a criminal prosecution." Manual, at III-82, §F.I (Apr. 2015). The staff request "should forward the grand jury request memorandum to the field office chief for review. If approved by the chief, the grand jury request memorandum should be emailed to the [Antitrust Criminal Enforcement Division]." *Id*. "The DAAG [Deputy Assistant Attorney General] for Operations, the Criminal DAAG, and the Director of Criminal Enforcement will make a recommendation to the Assistant Attorney General. If approved by the Assistant Attorney General, letters of authority are issued for all attorneys who will participate in the grand jury investigation." *Id.* at III-83. "The

investigation should be conducted by a grand jury in a judicial district where venue lies for the offense, such as a district from or to which price-fixed sales were made or where conspiratorial communications occurred." *Id*. Thus, the fact that Actavis and Lannett and its employees received federal grand jury subpoenas is a strong indicator that antitrust offenses have occurred.

43.    The issue of skyrocketing generic drug prices is one of national importance. In addition to the DOJ subpoenas, Congress has taken an interest in the spiraling costs of generic drugs, holding hearings and calling for an investigation. In October 2014, Senator Bernie Sanders (I-Vt.) and U.S. Representative Elijah E. Cummings (D-Md.) launched an investigation into soaring generic drug prices.

44.    According to a press release issues by Sanders and Cummings, at that time, they wrote letters to 14 pharmaceutical companies that stated "'[w]e are conducting an investigation into the recent staggering price increases for generic drugs used to treat everything from common medical conditions to life-threatening illnesses.'" Cummings and Sanders cited a survey that found pharmacists across the country "'have seen huge upswings in generic drug prices that are hurting patients'" and having a "'very significant'" impact on pharmacists' ability to continue serving patients. The study for the National Community Pharmacists Association also found some patients refused to fill needed prescriptions because of rising prices.[6]

45.    "'It is unacceptable that Americans pay, by far, the highest prices in the world for prescription drugs. Generic drugs were meant to help make medications

---

[6]    Press Release, *Congress Investigating Why Generic Drug Prices Are Skyrocketing* (October 2, 2014), http://www.sanders.senate.gov/newsroom/press-releases/congress-investigating-why-generic-drug-prices-are-skyrocketing (last accessed Dec. 14, 2016).

affordable for the millions of Americans who rely on prescriptions to manage their health needs.  We've got to get to the bottom of these enormous price increases,'" Sanders said.

46.    "'When you see how much the prices of these drugs have increased just over the past year, it's staggering, and we want to know why,'" said Cummings.  "'I am very pleased that Chairman Sanders has joined me in this bicameral investigation because in some cases these outrageous price hikes are preventing patients from getting the drugs they need.'"

47.    On December 15, 2016, twenty states filed a lawsuit under seal in a Connecticut federal court against a group of generic drug makers alleging "evidence of a broad, well-coordinated and long-running series of schemes to fix the prices and allocate markets for a number of generic pharmaceuticals in the United States."  In concise commentary on the case, an agent with the Federal Bureau of Investigation stated, "[c]onspiring to fix prices on widely-used generic medications skews the market, flouts common decency – and very clearly breaks the law."[7]

**Trade Associations Facilitated Defendants' Scheme**

48.    The generic drug market is structured in a way that allows generic drug manufacturers, including defendants, to interact and communicate with each other directly and in person on a frequent basis.  According to an intelligence report from Policy and Regulatory Report, a source that was given inside information by a prosecutor involved with the government's generic pricing investigation said the DOJ

---

[7]  Matthew Perrone, *Federal prosecutors accuse execs of fixing drug prices*, Assoc. Press, Dec. 15, 2016.

is looking closely "'at trade associations as part of their investigation as having been one potential avenue for facilitating the collusion between salespeople at different generic producers.'"   The investigative subpoena issued to Lannett focuses on "communications or correspondence with competitors regarding the sale of generic prescription medications."

49.    As these regular trade meetings were ongoing, the prices for over a thousand generic pharmaceutical drugs skyrocketed in 2013 and 2014.  According to one report, "[t]he prices of more than 1,200 generic medications increased an average of 448 percent between July 2013 and July 2014."[8]  During this time, defendants met and interacted frequently at industry trade shows and multi-day conferences, including those hosted by the Generic Pharmaceutical Association ("GPhA"), the National Association of Chain Drug Stores, Healthcare Distribution Alliance and Efficient Collaborative Retail Marketing, among others.  At the many conferences and trade shows held by these organizations, representatives from generic drug manufacturers, including the defendants, interact with each other and discuss their respective businesses and customers and are provided with ample opportunity to discuss, devise and implement a host of anticompetitive schemes that unreasonably restrain competition in the generic drug market.

50.    For example, defendants regularly met together at GPhA meetings in and around the Class Period.  On February 19-21, 2014, defendants Actavis and Epic together attended the GPhA's multi-day annual meeting in Orlando, Florida.  Just four

---

[8]   Gillian Mohney, *Generic Drug Price Sticker Shock Prompts Probe by Congress*, ABC News, Nov. 21, 2014.

months later, defendants Actavis and Lannett met again for two days on June 3-4, 2014, in Bethesda, Maryland, at a GPhA workshop. As illustrated above, pricing data demonstrates that shortly after each of these meetings, defendants dramatically and uniformly inflated the cost of generic Ursodiol.

## THE GENERIC URSODIOL MARKET
## IS SUSCEPTIBLE TO ANTICOMPETITIVE CONDUCT

51.     Publicly available data on the generic Ursodiol market in the United States demonstrates its susceptibility to cartelization by the defendants. Factors that make a market susceptible to collusion include: (1) a high degree of industry concentration; (2) significant barriers to entry; (3) inelastic demand; (4) the lack of available substitutes for the goods involved; (5) a standardized product with a high degree of interchangeability between the goods of cartel participants; (6) absence of a competitive fringe of sellers; and (7) inter-competitor contacts and communications. Each of those factors is present here.

**Market Concentration**

52.     A high degree of concentration facilitates the operation of a cartel because it makes it easier to coordinate behavior among co-conspirators. In the U.S. generic Ursodiol market at times relevant here, the firms that control the vast majority of the market are the defendants. As discussed above, defendants' 2014 annual sales of Ursodiol – collective sales of roughly $372.76 million – for example, made up over 98% of Ursodiol sales.



53.   Defendants' collective dominance is also compellingly illustrated by comparing the Herfindahl-Hirschman Index ("HHI") for Ursodiol and for Benzodiazepine, which is another generic drug that belongs to an entirely different Anatomical Therapeutic Chemical classification code.  HHI is a standard measure of the size of firm concentration in relation to a given industry and an indicator of the amount of competition in that industry.   An HHI score of 0 indicates perfect competition whereas a score of 10,000 indicates a monopoly.  The DOJ classifies an industry as "concentrated" if the HHI exceeds 1,800 and considers markets in which the HHI is in excess of 2,500 to be "highly concentrated."[9]  As illustrated below, the HHI for Ursodiol was 3,500, which shows a highly concentrated market.  The Benzodiazepine index was close to half that of Ursodiol during the same timeframe and its price movements remained relatively stable:

_____

[9]   *See* https://www.justice.gov/atr/herfindahl-hirschman-index (last accessed Dec. 14, 2016*).*



**Barriers to Entry**

54.    Supracompetitive pricing in a market normally attracts additional competitors who want to avail themselves of the high levels of profitability that are available.  However, the presence of significant barriers to entry makes this more difficult and helps to facilitate the operation of a cartel.

55.    Here, there are significant capital requirements, high manufacturing costs, and regulatory and intellectual property barriers to entry into the generic Ursodiol market.  ANDAs alone, which are necessary to bring a new generic drug to market, take an average of 36 months to be approved by the FDA.  This process can take even longer if the FDA requires Tier 1 and 2 amendments.

56.    In addition, defendants – a very limited number of participants – dominate the Ursodiol market, one also considered too small on a worldwide basis to entice most of the world's major pharmaceutical manufacturers to enter.

**Demand Elasticity**

57.    Elasticity of demand is defined as the relationship between a change in the quantity demanded for a product or service and a change in price for the same

product.  More simply, it is a measure of the responsiveness of a change in price on the quantity demanded.  Demand is considered inelastic if an increase in price yields only a small decrease in quantity sold.

58.     Generic Ursodiol is an important and critical drug for the people who require it.  Patients consider it a necessity that must be purchased at whatever price the defendants offer it.  As such, demand for Ursodiol is inelastic.  Generic Ursodiol is an ideal product to fix the price of, as price increases result in significantly more revenue with little loss in sales volume.  Defendants were able to significantly increase Ursodiol prices with minimal effect on the quantity demanded.

59.     Ursodiol has an almost perfectly inelastic demand curve, as illustrated below.  Indeed, a 213% increase in price for Ursodiol capsules results in only a 2% decrease in quantity demanded.  For Medical Care and Insurance, however, a price increase of 125% would result in no more quantity being demanded.  Highly inelastic demand facilitates defendants' cartel behavior, because defendants are able to significantly raise Ursodiol prices with minimal effect on quantity demanded, but receive a massive upside of hundreds of millions of dollars gained:



| Examples | Ed | % Change in Price | % Change in Qd | Elasticity |
|---|---|---|---|---|
| Ursodiol | -0.01 | 213% | -2% | Highly inelastic |
| Medical Care and Insurance | -0.80 | 125% | -100% | Relatively inelastic |
| Public Transportation | -3.50 | 29% | -100% | Highly elastic |

**Lack of Substitutes**

60. While there are other drugs under the same code on the market (Act and/or their Therapeutic Characteristics ("ATC") code A05AA – bile acid preparations), there are significant barriers to change. Ursodiol is prescribed for specific health conditions, including gallbladder stone dissolution. Those who need Ursodiol use it because it is unique in its potency, formulation and effectiveness. There are no significantly prescribed close substitutes for Ursodiol.

61. A small but significant increase in the price of Ursodiol does not cause users to switch to other drugs. Even a large increase in price, such as occurred here,

did not cause most users to switch to another drug.  As Chenodiol, a drug that resides in the same ATC coding as Ursodiol and, as such, is similar in clinical effect, and ursodiol in tablet form illustrate, despite the similarity in effect, the total quantities sold of the three drugs has not significantly changed following defendants' (collective – and collusive) price hikes:



62.     Based on prescriptions filled nationally from January 2009 to the end of 2015, Ursodiol remains the prescription of choice over Chenodiol and ursodiol tablets for doctors and consumers, as depicted below.  Even if there were a sea-change shift toward Chenodiol in prescriptions, defendants' scheme would not see any material change for a number of reasons, including that co-pay tiering changes take significant time (up to a two-year lag), consumers have little incentive to change a repeat prescription since price shock is absorbed by insurers and Medicare, and there are explicit barriers forbidding Medicare to negotiate prices.

**High Degree of Interchangeability**

63.     A commodity-like product is one that is standardized across suppliers and allows for a high degree of substitutability among different suppliers in the market. When products offered by different suppliers are viewed as interchangeable by purchasers, it is easier for the suppliers to agree on prices for the product in question and it is easier to monitor these prices effectively.  Generic drugs are by definition interchangeable.

64.     The generic Ursodiol products made by the defendant manufacturers are chemically identical.  The FDA requires that products be coded "AB" if a study demonstrating bioequivalence is submitted.  The FDA lists Ursodiol as an AB-rated generic drug.   This confirms that all manufactured versions of Ursodiol are therapeutically equivalent to each other and pharmacists are able to substitute one manufacturer's version for another.  The following chart based on FDA application records for Ursodiol demonstrates this interchangeability:

| Drug Name | Active Ingredients | Strength | Form | Therapeutic Equivalent Code | Application Number | Company |
|-----------|-------------------|----------|------|-----------------------------|--------------------|---------|
| Actigall | Ursodiol | 300 mg | Capsule | AB | 019594 | Allergan Sales |
| Ursodiol | Ursodiol | 300 mg | Capsule | AB | 077895 | CorePharma |
| Ursodiol | Ursodiol | 300 mg | Capsule | AB | 075517 | Epic Pharma |
| Ursodiol | Ursodiol | 300 mg | Capsule | AB | 079082 | Lannett |
| Ursodiol | Ursodiol | 300 mg | Capsule | AB | 090530 | Mylan |
| Ursodiol | Ursodiol | 300 mg | Capsule | AB | 075592 | Teva |

**Absence of Competitive Sellers**

65.     Companies that are not part of the conspiracy can erode conspirators' market shares by offering products at lower, more competitive prices.  This reduces

revenue and makes sustaining a conspiracy more difficult. In the market for generic Ursodiol, there is no realistic threat that a fringe of competitive sellers will take market share from defendants. The defendants in the market for generic Ursodiol have oligopolistic power over the market, which facilitates their ability to raise prices without losing market share to non-conspirators. And, after the dramatic price increases, the data demonstrates no defendant is willing to meaningfully undercut prices to gain market share as would be expected in a competitive marketplace.

**Contacts and Communication Opportunities**

66.     In order to be successful, collusive agreements require a level of trust among the conspirators. Collaboration fostered through industry associations facilitates relationships between individuals who would otherwise be predisposed to compete vigorously with each other. Here, the defendants are members of or participants in the GPhA, which describes itself on its website as "the nation's leading trade association for manufacturers and distributors of generic prescription drugs, manufacturers of bulk active pharmaceutical chemicals, and suppliers of other goods and services to the generic industry."[10] Thus, representatives of the defendants have the opportunity to meet and conspire at functions of this group, as well as at multiple other trade shows, conferences, customer events, dinners and meetings. The grand jury subpoenas to Lannett and Actavis, requesting information about communications between the defendants here, lends further support to the conclusion that communications between competitors occurred with respect to the pricing of generic Ursodiol.

---

[10]    *See* http://www.gphaonline.org/about/membership (last accessed Dec. 14, 2016).

67.    In addition to their regular meetings at generic pharmaceutical industry events, defendants have access to and share significant and highly detailed market pricing and quantity information.  This information sharing provides opportunity to share information and facilitates pricing coordination, especially in a market with limited participants.  Federal DOJ and U.S. Federal Trade Commission ("FTC") antitrust guidelines acknowledge and are formed by the significance of this fact in the context of access to competitor information:

> A market typically is more vulnerable to coordinated conduct if each competitively important firm's significant competitive initiatives can be promptly and confidently observed by that firm's rivals.  This is more likely to be the case if the terms offered to customers are relatively transparent.   Price transparency can be greater for relatively homogeneous products. . . .  Regular monitoring by suppliers of one another's prices or customers can indicate that the terms offered to customers are relatively transparent.

> *     *     *

> The Agencies [*i.e.*, DOJ/FTC] regard coordinated interaction as more likely, the more the participants stand to gain from successful coordination.  Coordination generally is more profitable, the lower is the market elasticity of demand.[11]

68.    Here, in the highly inelastic generic Ursodiol market, dominated by defendants, defendants were actively able to ensure the success of their scheme and police for any cheating because they share and have access to one another's prices, market share, quantities sold and other material market and sales data.

---

[11]   U.S. Department of Justice and Federal Trade Commission, *Horizontal Merger Guidelines* §7.2 (Aug. 19, 2010).

## DEFENDANTS' ANTITRUST VIOLATIONS

69.     During the Class Period, defendants engaged in a continuing agreement, understanding and conspiracy in restraint of trade to artificially raise, fix, maintain or stabilize the prices of generic Ursodiol in the United States.

70.     In formulating and effectuating the contract, combination or conspiracy, the defendants identified above and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which was to artificially raise, fix, maintain and/or stabilize the price of generic Ursodiol sold in the United States.  These activities included the following:

(a)     Defendants participated in meetings and/or conversations to discuss the price of generic Ursodiol in the United States;

(b)     Defendants agreed during those meetings and conversations to charge prices at specified levels and otherwise to increase and/or maintain prices of generic Ursodiol sold in the United States;

(c)     Defendants agreed during those meetings and conversations to fix the prices of generic Ursodiol; and

(d)     Defendants issued price announcements and price quotations in accordance with their agreements.

71.     Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating the unlawful agreements described in this complaint.

72.     During and throughout the period of the conspiracy alleged in this complaint, plaintiff and members of the Class purchased generic Ursodiol at inflated and supracompetitive prices.

73.     Defendants' contract, combination or conspiracy constitutes an unreasonable restraint of interstate trade and commerce in violation of §§1 and 3 of the Sherman Act (15 U.S.C. §§1 and 3) and the laws of various states.

74.     As a result of defendants' unlawful conduct, plaintiff and the other members of the Class (as defined below) have been injured in their business and property in that they have paid more for generic Ursodiol than they would have paid in a competitive market.

75.     The unlawful contract, combination or conspiracy has had the following effects, among others:

        (a)     Price competition in the market for generic Ursodiol has been artificially restrained;

        (b)     Prices for generic Ursodiol sold by defendants have been raised, fixed, maintained or stabilized at artificially high and non-competitive levels; and

        (c)     Purchasers of generic Ursodiol have been deprived of the benefit of free and open competition in the market for generic Ursodiol.

## CLASS ACTION ALLEGATIONS

76.     Plaintiff brings this action as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure.  Plaintiff seeks to certify two classes, the first under federal antitrust laws and the second under the various state laws detailed in Counts II, III and IV.

77.     The Nationwide Class is brought under Fed. R. Civ. P. 23(a) and (b)(2) and seeks equitable and injunctive relief.  The Nationwide Class is defined as follows:

> All persons and entities in the United States, as defined herein, who purchased, paid and/or provided reimbursement for some or all of the purchase price of defendants' generic Ursodiol from May 9, 2014 through the present.  This class excludes: (a) defendants, their officers, directors, management, employees, subsidiaries and affiliates; (b) all federal and state governmental entities except for cities, towns or municipalities with self-funded prescription drug plans; (c) all persons or entities who purchased defendants' generic Ursodiol for purposes of resale or directly from defendants; (d) fully insured health plans (*i.e.*, health plans that purchased insurance covering 100% of their reimbursement obligation to members); (e) any "flat co-pay" consumers whose purchases of defendants' generic Ursodiol were paid in part by a third-party payor and whose co-payment was the same regardless of the retail purchase price; and (f) any judges or justices involved in this action and any members of their immediate families.

78.     Plaintiff also brings this action as a class action under Fed. R. Civ. P. 23(a) and (b)(3), seeking damages under the state antitrust, common law and consumer protection laws of the states listed below (the "Indirect Purchaser States"). This class is the Damages Class and is defined as follows:

> All persons and entities in the Indirect Purchaser States who purchased, paid and/or provided reimbursement for some or all of the purchase price of defendants' generic Ursodiol from May 9, 2014 through the present. This class excludes:     (a) defendants, their officers, directors, management, employees, subsidiaries and affiliates; (b) all federal and state governmental entities except for cities, towns or municipalities with self-funded prescription drug plans; (c) all persons or entities who purchased defendants' generic Ursodiol for purposes of resale or directly from defendants; (d) fully insured health plans (*i.e.*, health plans that purchased insurance covering 100% of their reimbursement obligation to members); (e) any "flat co-pay" consumers whose purchases of defendants' generic Ursodiol were paid in part by a third-party payor and whose co-payment was the same regardless of the retail purchase price; and (f) any judges or justices involved in this action and any members of their immediate families.

79.     The Nationwide Class and the Damages Class are referred to collectively herein as the "Class."

80.     Due to the nature of the trade or the commerce involved, plaintiff does not know the exact number of Class members involved; however, plaintiff believes that Class members are sufficiently numerous and geographically dispersed throughout the United States so that joinder of all Class members is impracticable.

81.     Plaintiff is a member of the Class, plaintiff's claims are typical of the claims of the Class members, and plaintiff will fairly and adequately protect the interests of the Class.  Plaintiff and Class members purchased generic Ursodiol at artificially maintained supracompetitive prices established by the actions of defendants in connection with the restraint of trade alleged herein.  Plaintiff's interests are coincident with and not antagonistic to those of the other members of the Class.

82.     Plaintiff is represented by counsel who are competent and experienced in the prosecution of complex class action litigation.

83.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for defendants.

84.     The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability, damages and restitution.  Among the questions of law and fact common to the Class are:

(a)     Whether defendants and their co-conspirators colluded to fix, raise, maintain and/or stabilize the price of generic Ursodiol in the United States;

(b)     Whether defendants violated §1 of the Sherman Act;

(c)     Whether defendants violated §3 of the Sherman Act;

(d)     Whether defendants violated the laws of the Indirect Purchaser States;

(e)     The duration of the conspiracy alleged in this complaint;

(f)     The nature and character of the acts performed by defendants in furtherance of the conspiracy;

(g)     Whether, and to what extent, the conduct of defendants caused injury to plaintiff and members of the Class, and, if so, the appropriate measure of damages; and

(h)     Whether plaintiff and members of the Class are entitled to injunctive relief to prevent the continuation or furtherance of the violation of §1 of the Sherman Act.

85.     A class action is superior to other methods for the fair and efficient adjudication of this controversy.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently and without the duplication of effort and expense that numerous individual actions would engender.  Class treatment will also permit the adjudication of claims by many Class members who could not individually afford to litigate an antitrust claim such as is asserted in this complaint.  This class action likely presents no difficulties in management that would preclude its maintenance as a class action.  Finally, the Class is readily ascertainable.

# COUNT I

## For Violation of §§1 and 3 of the Sherman Act
## on Behalf of Plaintiff and the Nationwide Class

86.   Plaintiff repeats the allegations set forth above as if fully set forth herein.

87.   During the Class Period, defendants engaged in a continuing combination or conspiracy to unreasonably restrain trade and commerce in violation of §§1 and 3 of the Sherman Act, 15 U.S.C. §§1 and 3, by artificially reducing or eliminating competition in the market for generic Ursodiol and engaging in a conspiracy to artificially fix, raise, maintain and/or stabilize the prices for generic Ursodiol in the United States.

88.   In particular, defendants have agreed, combined and conspired to raise, fix, maintain or stabilize the prices of generic Ursodiol in the United States.

89.   In formulating and effectuating their contract, combination or conspiracy, defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which was to artificially fix, raise, maintain and/or stabilize the prices of generic Ursodiol in the United States.

90.   Defendants' combination or conspiracy consisted of a continuing agreement, understanding and concerted action among defendants.

91.   Defendants' conspiracy had the effect of artificially inflating the price of generic Ursodiol in the United States.

92.   As a direct and proximate result of defendants' unlawful conduct, plaintiff and the other members of the Nationwide Class paid more for generic Ursodiol than they otherwise would have paid in the absence of defendants' unlawful conduct.

- 36 -

93.     By reason of defendants' unlawful conduct, plaintiff and members of the Nationwide Class have been deprived of free and open competition in the purchase of generic Ursodiol.

94.     As a direct and proximate result of defendants' conduct, plaintiff and members of the Nationwide Class have been injured and damaged in their business and property in an amount to be determined.

95.     These agreements constitute trade restraints made between direct competitors that are unlawful under all three applicable standards of review:  (1) the *per se* standard, which governs bid-rigging and the allocation of markets by horizontal agreement; (2) the "quick-look" standard, which governs apparently anticompetitive schemes with which the courts lack familiarity; and (3) the rule-of-reason standard (the "Rule of Reason"), which governs all other challenged restraints of trade. Plaintiff respectfully submits that the Court should apply well-recognized *per se* rules in order to condemn the challenged trade restraints, but in an abundance of caution pleads this claim in the alternative so that it is raised not only under the *per se* rules, but also under the "quick-look" standard and the Rule of Reason.

96.     Plaintiff and members of the Nationwide Class are entitled to an injunction against defendants, preventing and restraining the violations alleged herein.

## COUNT II

### Violation of State Antitrust Statutes
### on Behalf of Plaintiff and the Damages Class

97.     Plaintiff repeats the allegations set forth above as if fully set forth herein.

98.     During the Class Period, defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of generic

Ursodiol in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

99.     The contract, combination or conspiracy consisted of an agreement among defendants and their co-conspirators to fix, raise, inflate, stabilize and/or maintain artificially supracompetitive prices for generic Ursodiol and to allocate customers for generic Ursodiol in the United States.

100.    In formulating and effectuating this conspiracy, defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including: (a) participating in meetings and conversations among themselves in the United States during which they agreed to price generic Ursodiol at certain levels, and otherwise to fix, increase, inflate, maintain or stabilize effective prices paid by plaintiff and members of the Damages Class with respect to generic Ursodiol provided in the United States; and (b) participating in meetings and trade association conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

101.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, increase, maintain or stabilize prices of generic Ursodiol.

102.    As alleged in this complaint, defendants and their co-conspirators: entered into an unlawful agreement in restraint of trade; entered into and engaged in a continuing unlawful trust and concert of action in restraint of trade and commerce; and fixed, raised, stabilized and maintained prices of generic Ursodiol at supracompetitive levels.  The combination and conspiracy alleged herein has had,

*inter alia*, the following effects: (1) price competition for generic Ursodiol has been restrained, suppressed and/or eliminated; (2) prices for generic Ursodiol provided by defendants and their co-conspirators have been fixed, raised, stabilized and pegged at artificially high, noncompetitive levels; and (3) those who purchased generic Ursodiol directly or indirectly from defendants and their co-conspirators have been deprived of the benefit of free and open competition.   As a direct and proximate result of defendants' unlawful conduct, plaintiff and members of the Damages Class have been injured in their business and property in that they paid more for generic Ursodiol than they otherwise would have paid in the absence of defendants' unlawful conduct.   As a result of defendants' violations of law, plaintiff and members of the Damages Class seek treble damages and their cost of suit, including reasonable attorneys' fees. Defendants' anticompetitive acts described herein were knowing and willful and constitute flagrant violations of the antitrust statutes of the following states:

(a)      Illinois: The aforementioned practices by defendants were and are in violation of the Illinois Antitrust Act, 740 Ill. Comp. Stat. 10/1, *et seq*.; and

(b)      Wisconsin: The aforementioned practices by defendants were and are in violation of the Wisconsin Antitrust Act, Wis. Stat. §133.01, *et seq*.

103.   Plaintiff and members of the Damages Class in each of the above states have been injured in their business and property by reason of defendants' unlawful combination, contract, conspiracy and agreement.   Plaintiff and members of the Damages Class have paid more for generic Ursodiol than they otherwise would have paid in the absence of defendants' unlawful conduct.   This injury is of the type the

antitrust laws of the above states were designed to prevent and flows from that which makes defendants' conduct unlawful.

104.   In addition, defendants have profited significantly from the conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of plaintiff and the members of the Damages Class.

105.   Accordingly, plaintiff and the members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

## COUNT III

### Violation of State Consumer Protection Statutes
### on Behalf of Plaintiff and the Damages Class

106.   Plaintiff repeats the allegations set forth above as if fully set forth herein.

107.   As described herein, defendants have engaged in unfair competition or unfair, unconscionable or deceptive acts or practices.  Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which generic Ursodiol was sold, distributed or obtained and took efforts to conceal their agreements from plaintiff and members of the Damages Class.  Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by defendants to cover up their illegal acts.  Secrecy was integral to the formation, implementation and maintenance of defendants' price-fixing conspiracy.  Defendants committed inherently deceptive and self-concealing actions, of which plaintiff could not possibly

have been aware.  Defendants and their co-conspirators publicly provided pretextual and false justifications regarding their price increases.  Defendants' public statements concerning the price of generic Ursodiol created the illusion of competitive pricing controlled by market forces rather than supracompetitive pricing driven by defendants' illegal conspiracy.  Moreover, defendants deceptively concealed their unlawful activities by mutually agreeing not to divulge the existence of the conspiracy to outsiders.  The conduct of defendants described herein constitutes deceptive acts or practices within the meaning of the following state laws, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of consumers in an honest marketplace in which economic activity is conducted in a competitive manner.  Defendants' unlawful conduct had the following effects: (1) generic Ursodiol price competition was restrained, suppressed and eliminated; (2) generic Ursodiol prices were raised, fixed, maintained and stabilized at artificially high levels; (3) plaintiff and members of the Damages Class were deprived of free and open competition; and (4) plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Ursodiol.  During the Class Period, defendants marketed, sold, or distributed generic Ursodiol in the United States, and defendants' illegal conduct substantially affected commerce and consumers in the United States.  During the Class Period, each of the defendants named herein, directly, or indirectly and/or through affiliates they dominated and controlled, manufactured, sold and/or distributed generic Ursodiol in the United States.  Plaintiff and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are

threatened with further injury.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of the following state laws and, accordingly, plaintiff and members of the Damages Class seek all relief available under the following statutes:

(a)     Florida: The aforementioned practices by the defendants were and are in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. §501.201, *et seq*.;

(b)     Kentucky: The aforementioned practices by the defendants were and are in violation of Ky. Rev. Stat. §367.110, *et seq*.;

(c)     Missouri: The aforementioned practices by the defendants were and are in violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. §407.025;

(d)     New Jersey: The aforementioned practices by the defendants were and are in violation of N.J. Stat. Ann. §56:8-1, *et seq*.;

(e)     Ohio: The aforementioned practices by the defendants were and are in violation of Ohio Rev. Code §1345.01, *et seq*.; and

(f)     Wisconsin: The aforementioned practices by the defendants were and are in violation of Wisconsin's unfair competition statute, Wis. Stat. §100.20, *et seq*.

## COUNT IV

### Unjust Enrichment
### on Behalf of Plaintiff and the Damages Class

108.   Plaintiff repeats the allegations set forth above as if fully set forth herein.

109.   As a result of their unlawful conduct described above, defendants have and will continue to be unjustly enriched.  Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices for, and unlawful profits on, generic Ursodiol.

110.   Defendants have benefited from their unlawful acts and it would be inequitable for defendants to be permitted to retain any of the benefits resulting from the overpayments made by plaintiff and the members of the Damages Class for generic Ursodiol manufactured by defendants during the Class Period.

111.   Plaintiff and the members of the Damages Class are entitled to the amount of defendants' ill-gotten gains resulting from their unlawful, unjust and inequitable conduct.  Plaintiff and the members of the Damages Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which plaintiff and the members of the Damages Class may make claims on a *pro rata* basis.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff requests that the Court enter judgment on plaintiff's behalf and on behalf of the Class herein, adjudging and decreeing that:

A.     This action may proceed as a class action, with plaintiff as the designated Class representative and its counsel as Class Counsel;

B.     Defendants have engaged in a combination and conspiracy in violation of §§1 and 3 of the Sherman Act, 15 U.S.C. §§1 and 3, and plaintiff and the members of the Class have been injured in their business and property as a result of defendants' violation;

- 43 -

C.      Plaintiff and the members of the Class are entitled to recover damages sustained by them, as provided by the state antitrust laws listed in Count II and the consumer protection laws listed in Count III, an injunction under federal antitrust laws, and to a joint and several judgment in favor of plaintiff and the Class being entered against defendants in an amount to be trebled in accordance with such laws;

D.      Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents and employees thereof and all other persons acting or claiming to act on their behalf be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy or agreement alleged herein;

E.      Plaintiff and members of the Class be awarded pre-judgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

F.      Plaintiff and members of the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

G.      Plaintiff and members of the Class receive such other or further relief as may be just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury of all issues triable by jury.

DATED:  January 30, 2017

SEEGER WEISS LLP
CHRISTOPHER A. SEEGER
DAVID R. BUCHANAN
JENNIFER R. SCULLION
(*pro hac vice* admission to be requested)


s/  Christopher A. Seeger

CHRISTOPHER A. SEEGER

550 Broad Street, Suite 920
Newark, NJ  07102
Telephone:  973/639-9100
973/639-9393 (fax)
cseeger@seegerweiss.com
dbuchanan@seegerweiss.com
iscullion@seegerweiss.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
DAVID W. MITCHELL
BRIAN O. O'MARA
ALEXANDRA S. BERNAY
CARMEN A. MEDICI
ARTHUR L. SHINGLER III
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
PAUL J. GELLER
MARK J. DEARMAN
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)

BOIES, SCHILLER & FLEXNER LLP
DAMIEN J. MARSHALL
DUANE L. LOFT
MATTHEW S. TRIPOLITSIOTIS
575 Lexington Avenue, 7th Floor
New York, NY  10022
Telephone:  212/446-2300
212/446-2350 (fax)

CAVANAGH & O'HARA
PATRICK J. O'HARA
2319 West Jefferson Street
Springfield, IL  62702
Telephone:  217/544-1771
217/544-9894 (fax)

Attorneys for Plaintiff